[No. 23638.   *En Banc.*   April 11, 1933.]

E. L. BLAINE, *Appellant*, v. GARDNER J. GWINN, INC.,
*Respondent.*[1]

*Edwin C. Ewing,* for appellant.

*Allen, Froude, Hilen & Askren,* for respondent.

*McMicken, Ramsey, Rupp & Schweppe, amici curiae.*

BLAKE, J.—This is an action on a promissory note
for fifteen thousand dollars, executed by defendant to
plaintiff.   The note was secured by a second mortgage

[1]Reported in 20 P. (2d) 855.

on real estate, but plaintiff waived the security. From a judgment dismissing the action, plaintiff appeals.

The transaction out of which the cause of action arose is extremely complicated. It can be best understood by a chronological narrative of the high lights, as shown by the testimony and documentary evidence.

Blaine was the owner of lots 1 and 2, block 34, and the west half of lots 6, 7 and 8, block 28, in Comstock's Supplemental Addition to Seattle. On November 8, 1926, he conveyed this property to Gwinn. The consideration recited in the deed was ten dollars. The real consideration was a promissory note for fifteen thousand dollars, executed November 20, 1926, payable in five years. To secure the note, Gwinn, on the same day, executed a mortgage on all of the above described property. It was stipulated in this mortgage that, as to lots 1 and 2, block 34, it should be inferior and subordinate to a first mortgage for thirty-three thousand dollars, thereafter to be placed on such lots. The proceeds from the thirty-three thousand dollar mortgage were to go into the construction of an apartment house on these lots. Blaine agreed that, as soon as the roof was on the building, he would release the mortgage as to the west half of lots 6, 7 and 8, block 28.

Pursuant to this understanding, Blaine, on February 10, 1927, signed what was called a "subordination of mortgage agreement." This purported to be a *tripartite* agreement between Blaine, as first party, respondent, as second party, and Seattle Mortgage Loan Company, as third party, but it was executed only by Blaine. It recited that the mortgage company was willing to make a loan of thirty-three thousand dollars to Gwinn on lots 1 and 2, block 34, provided Blaine agreed that such mortgage should be a first

lien on the property. To this Blaine agreed in the following terms:

"Now, therefore, in consideration of the premises and of the sum of One Dollar to the party of the first part in hand paid by each of the parties of the second and third parts, receipt whereof is hereby acknowledged, the party of the first part does hereby covenant, grant and agree to and with the said party of the second part, and the said party of the third part, that the lien on said described premises of the said proposed mortgage to be executed on terms aforesaid, to the party of the third part shall at all times be and remain prior, paramount and superior to the lien of the said mortgage of the party of the first part first herein mentioned, notwithstanding the relative dates of execution, delivery or record of the said mortgages."

Gwinn thereafter executed a mortgage for thirty-three thousand dollars to Seattle Mortgage Loan Company. On June 8, 1927, Blaine executed a release of his mortgage as to the west half of lots 6, 7 and 8, block 28.

Now, before proceeding with the narrative of the events which go to make up the history of this transaction, let us pause and ascertain where the parties then stood and what their rights were in the respective properties. Blaine had parted with title to lots 1 and 2, block 34, and the west half of lots 6, 7 and 8, block 28, and had released the lien of his mortgage as to the latter. He had received no money. All that he had to show for his property was Gwinn's note for fifteen thousand dollars, which was secured by a second mortgage on lots 1 and 2, block 34. Gwinn owned the west half of lots 6, 7 and 8, block 28, free from encumbrance, and owned lots 1 and 2, block 34, subject to the thirty-three thousand dollar mortgage to the Seattle Mortgage Loan Company, for which indebtedness he was personally liable, and subject also to

Blaine's mortgage, for which indebtedness he was also personally liable. In other words, he had Blaine's property, but he was personally responsible for the payment of thirty-three thousand dollars to the Seattle Mortgage Loan Company and fifteen thousand dollars to Blaine. This situation of the parties and the property should be kept in mind in considering the events from this point on.

On July 1, 1927, Gwinn entered into a contract to sell lots 1 and 2, block 34, to John R. Esmond for seventy-five thousand dollars. By the terms of the contract, Gwinn acknowledged receipt of $20,700. Esmond was to pay the balance of the purchase price by the assumption of the mortgage of thirty-three thousand dollars to Seattle Mortgage Loan Company, the assumption of the Blaine mortgage of fifteen thousand dollars and the balance of $6,300 in monthly installments of not less than one hundred and fifty dollars, until paid. Of the $20,700, payment of which was acknowledged in the contract, fifteen thousand dollars was cash.

On August 1, 1927, Gwinn sold his vendor's interest in lots 1 and 2, block 34, to Worthington Fisher Company. He executed to that company a statutory warranty deed, for a nominal consideration, by the terms of which Worthington Fisher Company took title to the property *subject* to the mortgages to Seattle Mortgage Loan Company and Blaine. The actual consideration paid Gwinn by Worthington Fisher Company was about five thousand dollars.

Now, before proceeding further with the narrative, let us pause and take stock again. The title to the property was in Worthington Fisher Company, *subject* to the mortgages to Seattle Mortgage Loan Company and Blaine for thirty-three thousand dollars and fifteen thousand dollars, respectively, and subject to

Esmond's contract. Gwinn had received twenty thous-
and dollars in cash, and property of the ostensible
value of $5,700, and had become secondarily liable on
the mortgages by reason of Esmond's assumption of
them in the contract of July 1. And bear in mind, he
still had title to the west half of lots 6, 7 and 8, block
28, free from encumbrance. On October 30, 1927,
Worthington Fisher Company conveyed lots 1 and 2,
block 34, to John R. Esmond, the contract purchaser,
by statutory quit claim deed, in which no mention of
the mortgages was made.

One Jenner was the guiding spirit of the Seattle
Mortgage Loan Company. At his request, Blaine, on
November 1, 1927, executed a prior lien agreement in
which he was designated first party, Securities Mort-
gage Company second party, and Esmond third party.
This agreement was executed by Blaine alone. The
agreement recites that the Securities Mortgage Com-
pany was willing to loan Esmond thirty-three thousand
dollars on the property, provided Blaine agreed that
such mortgage should be a lien prior to his mortgage.
It provides:

"Now, therefore, in consideration of the sum of One
and No/100 ($1.00) Dollars, to the party of the first
part in hand paid, by each of the parties of the second
and third part, receipt whereof is hereby acknowledged
and in consideration of the said parties of the third
part or either of them becoming record owners or
owner of said described premises, subject to the lien
of the said mortgage of the party of the first part, the
party of the first part does hereby covenant, grant
and agree to and with the said parties of the second
and third part that the lien of the said proposed mort-
gage of the party of the second part from and after
the date of its record shall be and at all times remain
prior, paramount and superior to the lien of the said
mortgage of the party of the first part.

"In witness whereof, the party of the first part has

hereunto set his hand and seal the day and year first above written.''

The terms of the mortgage described are different than the original mortgage, in that the time of payment was extended five years, and no sinking fund was provided for, as in the original mortgage. Also, the provisions as to insurance were less stringent.

Esmond, on November 1, 1927, executed a mortgage to the Securities Mortgage Company. On November 4, Seattle Mortgage Loan Company executed a release of the Gwinn mortgage of thirty-three thousand dollars; and on the same day Esmond executed a statutory warranty deed of the property to Worthington Fisher Company, subject to the thirty-three thousand dollar mortgage to Securities Mortgage Company and the fifteen thousand dollar mortgage to Blaine. Worthington Fisher Company, on November 5, entered into a contract to sell the property to Esmond for seventy-five thousand dollars. Receipt of $21,-004.55 was acknowledged in the contract. As a part of the consideration, Esmond assumed the two mortgages and agreed to pay the balance of $5,995.45 in monthly installments of not less than one hundred and fifty dollars.

This substitution of the Securities Mortgage Company for Seattle Mortgage Loan Company was not brought about by Esmond or Blaine. Neither profited by it in any way. They did not meet or consult about it at any time. Each was approached separately by Jenner, who, for purposes of his own, requested Blaine, on the one hand, to consent to the substitution, and Esmond, on the other, to execute the new mortgage.

Now, let us see what was the situation of Gwinn and Blaine. Gwinn had a clear title to the west half of lots 6, 7 and 8, block 28. He had the twenty thousand

dollars cash, and property of the value of $5,700, out of his deal with Esmond. And, on top of that, his personal liability on the mortgage indebtedness to Seattle Mortgage Loan Company had been liquidated by the substitution of the mortgage to the Securities Mortgage Company. Blaine had Gwinn's fifteen thousand dollar note, secured by a second mortgage on lots 1 and 2.

But it is the contention of Gwinn that Blaine cannot waive the mortgage and recover on the note, because, forsooth, he consented to the substitution of the Securities Mortgage Company mortgage for that of the Seattle Mortgage Loan Company. This contention is predicated upon a pure fiction, which is that, under the contract between Gwinn and Esmond whereby the latter assumed the fifteen thousand dollar mortgage, Blaine became the obligee in a contract of suretyship, and that Blaine, by consenting to a first mortgage different in terms from the Gwinn mortgage to the Seattle Mortgage Loan Company, has somehow consented to a change in the obligation, to the prejudice of Gwinn, whereby the latter, in his position of surety, has been released from his obligation on the fifteen thousand dollar note.

Of course, as between a mortgagor and his vendee, who assumes the mortgage, the latter becomes primarily liable for the debt and the former secondarily liable. To describe the relationship thus arising, the courts borrowed from the terminology of the law of suretyship, and called the vendee the principal and the mortgagor surety to the obligation. This is all very well until they go one step more and apply a substantive principle of the law of suretyship to the situation of the mortgagee, namely, that he becomes the obligee of a contract of suretyship, with all the attendant obligations.

This new status is imposed upon him without his consent. When he loans his money, he has the responsibility of choosing his debtor. If he fails to choose one of moral and financial worth, the responsibility is his own. But when the mortgagor conveys the property to one assuming the debt, this application of the law of suretyship places the mortgagee in a position where he must deal, at his peril, with a debtor not of his own choice. It must be admitted that, under the rule adopted by most of the courts, this is the position in which a mortgagee is placed when the mortgaged property is conveyed to one assuming the mortgage; and this court is committed to that doctrine. *Gillman v. Purdy,* 167 Wash. 659, 9 P. (2d) 1092.

But that doctrine does not apply to the facts of this case. Blaine had no concern whatever with the terms of Gwinn's mortgage to Seattle Mortgage Loan Company or Esmond's mortgage to Securities Mortgage Company. By consenting that there should be another thirty-three thousand dollar mortgage prior to his own, he did no more than that which he had originally agreed with Gwinn that he would do. The contract of sale to Esmond did not place Blaine in the position of the obligee of a contract of suretyship with respect to the mortgage of the Seattle Mortgage Loan Company. The contract of suretyship arising from the conveyance to Esmond, with respect to that mortgage, made Esmond the principal debtor, Gwinn the surety, and Seattle Mortgage Loan Company the obligee.

It was not Blaine's act, but Esmond's, that changed the terms of the first mortgages. In any event, the fact that the mortgage of Esmond to Securities Mortgage Company did not provide for a sinking fund did not hurt Gwinn. By Blaine's consent to, and the ex-

ecution of, the new mortgage, Gwinn has entirely escaped liability, either as principal or surety, on the first mortgage of thirty-three thousand dollars; and his obligation to Blaine was in no wise changed. So far as the sinking fund provision was concerned, it was a protection to Gwinn only on the first mortgage. Since he has been relieved of all liability on the first mortgage, the absence of the sinking fund agreement in the substituted first mortgage has affected his situation not at all. So that, in executing the second prior lien agreement, Blaine has not in any wise modified or changed the original obligation undertaken by Gwinn in the execution of the fifteen thousand dollar note and mortgage. The note is still payable according to its terms, without modification even as to time of payment.

But it is contended that, at the time Blaine executed the prior lien agreement, the property was of sufficient value to liquidate both mortgages. That does not affect Gwinn's situation, because Blaine always had the option to sue on the note and waive his mortgage security. *Frye v. Meyer,* 22 Wash. 277, 60 Pac. 655; *New Amsterdam Casualty Co. v. Frazier,* 142 Wash. 230, 252 Pac. 703; *Federal Land Bank v. Miller,* 155 Wash. 479, 284 Pac. 751.

The judgment is reversed, and remanded with directions to enter judgment for plaintiff, as prayed for.

BEALS, C. J., MILLARD, STEINERT, MITCHELL, and MAIN, JJ., concur.

TOLMAN, J., dissents.

HOLCOMB, J. (dissenting)—This case involves a change in security and an entirely new contract, to the detriment of respondent, as found by the trial court, which though concededly "ill-advised and im-

provident'' on the part of appellant, the effect of his acts and conduct was to create a new contractual relationship as payee of the note, and to create a liability entirely upon the contract of assumption.

Respondent pleaded and established an estoppel, and the court found that appellant was estopped from maintaining this action by virtue of Rem. Rev. Stat., § 3509, subd. 4. Regardless of other reasons assigned by the trial court for its judgment of dismissal, this defense should be sustained under the facts in the case and the judgment affirmed.

For these reasons, I dissent.